UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
MARIAMA BARRIE on behalf of the infant F.T.,

                          Plaintiff,

         -against-

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,

                          Defendant.
------------------------------------------------------------------x

**REPORT AND
RECOMMENDATION**

16 Civ. 5150 (CS)(JCM)

To the Honorable Cathy Seibel, United States District Judge:

Plaintiff Mariama Barrie ("Plaintiff"), appearing *pro se*, commenced this action on behalf

of her daughter ("F.T.") pursuant to 42 U.S.C. § 405(g), challenging the decision of the

Commissioner of Social Security ("the Commissioner"), which denied F.T.'s application for

disability benefits, finding her not disabled.  Presently before this Court is the Commissioner's

motion for judgment on the pleadings to affirm the Commissioner's decision pursuant to Rule

12(c) of the Federal Rules of Civil Procedure ("Rule 12(c)"). (Docket Nos. 12, 13).  Plaintiff has

not filed a cross-motion.  For the reasons below, I respectfully recommend that the

Commissioner's motion should be denied and the case should be remanded[2] for further

administrative proceedings.

No objections to this Report and Recommendation ("R&R") have been received.  I have reviewed it for clear error and find no error, clear or otherwise.  Accordingly, the R&R is adopted as the decision of the Court.  The Commissioner's motion is DENIED and the case is REMANDED for further administrative proceedings consistent with this decision. The Clerk of Court is respectfully directed to mail a copy of this endorsement to Plaintiff and terminate the pending motion, (Doc 12).

SO ORDERED.

[1] Nancy A. Berryhill is now the Acting Commissioner of ~~former Acting~~
Commissioner Carolyn W. Colvin as the Defendant in th ~~Federal Rules of~~
Civil Procedure.

*Cathy Seibel*
CATHY SEIBEL, U.S.D.J.

[2] The Court recommends that the case be remanded pursuant to sentence four of 42 U.S.C. § 405(g).

June 12, 2017

## I. BACKGROUND

F.T. was born on June 24, 2002. (R.[3] 60).  On July 23, 2013, when F.T. was eleven years old, Plaintiff filed a supplemental security income ("SSI") application on F.T.'s behalf, alleging that F.T. became disabled on June 24, 2002, her date of birth, due to a kidney problem, a thyroid problem and asthma. (R. 60-61, 105-114).  The Social Security Administration ("SSA") denied the application on November 19, 2013. (R. 69-74).  Plaintiff appealed the denial, and on June 9, 2015 Plaintiff and F.T., who was represented by an attorney, testified before Administrative Law Judge ("ALJ") Seth J. Grossman. (R. 28-59, 76).  On August 6, 2015, ALJ Grossman affirmed the denial of benefits, concluding that F.T. was not disabled under the Social Security Act ("Act"). (R. 6-27).  The Appeals Council considered additional evidence and denied Plaintiff's request for review on June 7, 2016, making the ALJ's decision the final decision of the Commissioner subject to review. (R. 1-5).

Thereafter, Plaintiff appealed the SSA's decision by submitting her complaint in the present action to the *Pro Se* Office of this Court on June 29, 2016. (Docket No. 2).  The Commissioner filed a motion for judgment on the pleadings under Rule 12(c) on December 12, 2016. (Docket Nos. 12, 13).  Plaintiff did not timely oppose the motion or cross move.  By Order dated February 21, 2017, the Court extended Plaintiff's time to respond or otherwise notify the Court as to her status until March 7, 2017. (Docket No. 14).  Plaintiff did not respond, and the Court deemed this matter fully submitted.

---

[3] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social security benefits on F.T.'s behalf, filed in this action on October 13, 2016. (Docket No. 8).

## A. F.T.'s Medical Treatment History

The administrative record reflects treatment F.T. received for her kidneys, bladder and urinary tract starting in 2006.[4]  Although Plaintiff alleged that F.T.'s disability began on her date of birth, (R. 60), retroactive SSI benefits are not available. 20 C.F.R. §§ 416.330, 416.335; *see also Rodriguez v. Colvin*, No. 13CV07607 (DF), 2015 WL 1903146, at *1 n.2 (S.D.N.Y. Mar. 31, 2015).[5]  Specifically, the period at issue begins on the date of her application, July 23, 2013, (R. 60, 132), and runs through the date of the ALJ's decision, August 6, 2015, (R. 6). *See* 20 C.F.R. § 416.330; *see also Brown v. Comm'r of Soc. Sec.*, No. 15-CV-06685 (SN), 2016 WL 3039892, at *13 (S.D.N.Y. May 27, 2016); *Daley ex rel. D.J.D. v. Comm'r of Soc. Sec.*, No. 12 CIV. 5506 (KBF), 2014 WL 642858, at *1 (S.D.N.Y. Feb. 14, 2014).  Nevertheless, the ALJ considered F.T.'s complete medical history pursuant to 20 C.F.R. § 416.912(d). (R. 9).

## 1. Medical Records Prior to the Period at Issue[6]

## a. Pediatric Urology Associates

F.T. had numerous appointments at Pediatric Urology Associates, P.C. ("Pediatric Urology") from at least May 2007 through March 2013; her treatment there continued through the relevant period, as discussed *infra* Section I(A)(2)(b).  It appears that F.T. was treated primarily by Dr. Israel Franco, whom she saw at least twenty-five times prior to the period at issue, (*e.g.*, R. 265-66, 269-70, 272-77, 280-96, 298-305, 317-24, 348-54), and Dr. Paul

---

[4] The medical records do not reflect treatment Plaintiff received for her thyroid or asthma.

[5] In accordance with *Lebron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009) and Local Civil Rule 7.2 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, a copy of this case and any others cited herein, only available by electronic database, accompany this Report and Recommendation and shall be simultaneously delivered to the *pro se* Plaintiff.

[6] In keeping with the ALJ's review of the entire medical record, (R. 9), the Court has also reviewed F.T.'s complete medical record.  However, because the relevant period did not begin until July 23, 2013, the date of F.T.'s application, *see* 20 C.F.R. § 416.330, the Court's description of records prior to that date is summary.

Zelkovic, whom she saw less frequently, but on at least ten occasions before the relevant period, (*e.g.*, R. 267-68, 278-79, 325-26, 328-29, 344-47, 421, 423).  She received treatment for repeated urinary tract infections ("UTI"), (*e.g.*, R. 276, 287, 289, 293, 333, 412, 421-23, 426), and had multiple operations related to a kidney transplant and a Mitrofanoff, which is a procedure for bladder drainage, (*e.g.*, R. 269-71; 282-86, 321-22, 330, 348).  For example, an operative report prepared by Dr. Franco and dated July 14, 2009 diagnosed F.T. with obstruction of her transplant kidney and indicated that Dr. Franco performed the following procedures: (i) cystoscopy of pouch via Mitrofanoff; (ii) nephroscopy; (iii) insertion of new "sp tube;" (iv) balloon dilation of ureteral stricture; and (v) insertion of ureteral catheter. (R. 282-83; *see also* R. 493-94[7]). Another operative report, completed by Dr. Franco on September 15, 2009, diagnosed F.T. with ureteral obstruction in her transplant kidney, and indicated that he and Dr. Edward Reda performed a ureteral implantation. (R. 269-71; *see also* R. 482).  As a third example, in an operative report dated October 24, 2012, Dr. Franco reported that Plaintiff underwent the following procedures: (i) revision of Mitrofanoff stoma; (ii) repair of ventral hernia defect; (iii) excision of 20 cm scar defect with multilayer closure; and (iv) excision of 5 cm scar defect with multilayer closure. (R. 321-22; *see also* R. 478).

**b. Westchester Medical Center**

Many of the operative reports from Pediatric Urology are repeated in the records from Westchester Medical Center. (*Compare, e.g.*, R. 285-86, *with* 492).  In addition, the records from Westchester Medical Center include an operative report from Dr. Franco, dated January 30, 2006, in which he described F.T. as a patient with end-stage renal disease and a dysplastic right kidney, and explained that she had a pyelostomy performed at birth, which was in the process of

---

[7] Many of the operative reports are repeated in records from Westchester Medical Center.

being reversed. (R. 498). He diagnosed her with chronic renal failure with pyelostomy, and indicated that he performed a closure of the pyelostomy, an open insertion of a stent, and a revision of the wound. (R. 498). The records further reflect multiple lab reports ordered by Dr. Anna Zolotnitskaya. (R. 452-61, 463-68). It is also clear from the Westchester Medical Center records that F.T. was hospitalized several times. For example, she was hospitalized from July 5, 2011 through July 7, 2011 and was treated by Dr. Zolotnitskaya for transplant glomerulonephropathy. (R. 200-10). She was hospitalized again from December 31, 2012 through January 3, 2013 for a UTI. (R. 170).

### c. Children's and Women's Physicians of Westchester

F.T. received treatment from Dr. Zolotnitskaya at the Children's and Women's Physicians of Westchester, Section of Pediatric Nephrology. (R. 297). In a letter dated May 23, 2008, Dr. Zolotnitskaya wrote that she had seen F.T. two days earlier for a follow-up of her renal transplant status. (R. 297). She noted that her physical exam was "significant for a discharge from her gastrostomy site," and that "[d]espite the fact that [it] was closed over a year ago, there is persistent discharge[.]" (R. 297). She also found that F.T.'s "urinary drainage remains from ureterostomy," and indicated that there were "no immediate plans to reconstruct her urinary tract." (R. 297). She recommended that F.T. follow up with Pediatric Urology and Pediatric Surgery, and that she would see F.T. again in three months. (R. 297). However, there are no further records from the Children's and Women's Physicians of Westchester.

### d. Montefiore Medical Center

Treatment notes from Montefiore Medical Center immediately precede the period at issue. On May 22, 2013, F.T. had a pediatric follow up with Dr. Aldo Chavez. (R. 234-36). She received a PCV13 immunization, as recommended by her nephrologist, Dr. Zolotnitskaya. (R.

234).  She had a well child checkup with Dr. Barbara Lew on June 27, 2013. (R. 237-46).  Dr.

Lew noted that her last asthma attack was over one year earlier, and that she had seen her

pulmonary doctor six months prior to the visit. (R. 237).  She described F.T. as an "excellent

student," noted that she wanted to be a doctor, and that her activities included "friends" and

basketball. (R. 238).

## 2.  Medical Records During the Period at Issue

### a.  Montefiore Medical Center

F.T. had a follow-up visit with Dr. Lew on August 28, 2013. (R. 247-52).  She noted that

F.T. was "doing well," and that she had an appointment with nephrology in one month. (R. 247).

She reviewed F.T.'s past medical history, noting "many hospitalizations" at Westchester Medical

Center, a kidney transplant in 2006, a Mitranoff [sic] revision in 2013, and that F.T. self-

catheterized every three to four hours. (R. 247).  Dr. Lew listed F.T.'s treating physicians as

follows: (i) Dr. Zolotnitskaya as her nephrologist; (ii) Dr. Trigger as her pulmonologist; (iii) Dr.

Franco as her urologist; and (iv) Dr. Zang as her eye doctor. (R. 247).  F.T. was eleven years and

two months old at the time of her visit, was in the seventy-second percentile of height and the

sixty-second percentile of weight. (R. 248).  In terms of her gastrointestinal system, F.T. denied

vomiting, diarrhea, constipation and abdominal pain, and a review of her genitourinary system

revealed that she had good urine output. (R. 247).  Upon physical examination, F.T.'s lungs were

clear to auscultation, with no rhonchi, rales or wheezing. (R. 249).  Dr. Lew assessed F.T.'s

congenital renal dysplasia as unchanged and her asthma as improved, and also noted her history

of kidney transplantation. (R. 249-50).  Her medications were: (i) Cellcept 250 mg, two caps

twice daily; (ii) Ferrex 150 mg, one cap daily; (iii) Flovent HFA 44 MCG, two puffs twice daily;

(iv) Macrodantin 50 mg, one cap daily; (v) Prograf 0.5 mg, three caps every morning; (vi)

Prograf 1 mg, two caps every evening; (vii) Ventolin HFA 108 MCG, two puffs every four hours as needed; (viii) Benzoyl peroxide 10% lotion, once or twice daily; and (ix) Benzoyl peroxide 10% gel, daily. (R. 250). F.T. had three immunizations. (R. 251).

**b. Pediatric Urology**

F.T.'s treatment at Pediatric Urology continued during the relevant period. She was treated from at least October 2013 through April 2015. (R. 307-16). On October 1, 2013, she had an appointment with Dr. Franco regarding her kidney transplant. (R. 315). He noted that she was eleven years and three months old at the time. (R. 315). She was "still . . . having issues with leaking from the Mitrofanoff," although Plaintiff told Dr. Franco that F.T. "spen[t] only a minute waiting for the urine to come out before she stops draining." (R. 315). Upon physical examination, F.T.'s stoma was "patent and pink" and "leaked" when Dr. Franco pressed on her abdomen. (R. 315). Her right kidney was palpable. (R. 315). He concluded that a urodynamic analysis was needed to determine "when she leaks and at what pressure she leaks," and commented that "[i]f the pressures are low at leakage then we may need to revise the stoma once again." (R. 315).

On October 8, 2013, F.T. returned to Pediatric Urology for a urodynamic study with Dr. Lori Dyer. (R. 313-14). F.T. reported leaks from the Mitrofanoff when full more than once per day over the previous several months. (R. 313). She also indicated leaks from the Mitrofanoff overnight and complained of bladder spasms, but stated that she had no difficulty catheterizing. (R. 313). The assessment revealed, *inter alia*, low storage pressures and uninhibited contractions during the second half of filling, which Plaintiff sensed. (R. 313). The first study was stopped due to F.T.'s discomfort, and a second study was performed, with similar results. (R. 313). F.T. saw Dr. Franco again on November 4, 2013, to review the results of the urodynamic study. (R.

311-12).  His notes indicate that he "hope[d] that the Ditropan can staunch these contractions[,] which are likely due to ileocecal segment," and that "[i]f the oral Ditropan doesn't work we can try intravesical Ditropan which in some cases can be effective." (R. 311).  Dr. Franco instructed F.T. to follow up in two to six months, including for additional urodynamics. (R. 312).

The next treatment record from Dr. Franco is from March 10, 2014, approximately four months later. (R. 309-10).  He stated that she "continue[d] to leak urine when she holds her urine for long periods of time," and that this "seem[ed] to be a problem at school when they do not allow her to catheterize when she has the urge to urinate." (R. 309).  He further noted that she continued to leak overnight, when her bladder was filled to capacity. (R. 309).  Physical examination indicated that F.T.'s right kidney was palpable, that her stoma was pink, patent and had a Mitrofanoff, and that she had multiple, well-healed scars; there was no tenderness. (R. 309).  He determined that F.T. should try to use a Foley catheter throughout the night, which he thought would stop nighttime leakage as well as reduce pressure on her kidney. (R. 309).  Dr. Franco also gave her a note for school instructing that she was "not necessarily on a fixed time schedule," but that instead she felt the "sensation to void as any other normal sensate person should do." (R. 309-10).  He instructed her to follow up in six months. (R. 310).

Finally, F.T. saw Dr. Edward Reda on April 17, 2015. (R.307-08).  Dr. Reda noted that she was twelve years old at the time of the visit. (R. 307).  F.T. complained that she continued to leak urine and that she "soak[ed]" overnight. (R. 307).  Further, she self-catheterized three times per day at school but sometimes leaked between catheterizations. (R. 307).  She reported no difficulty catheterizing. (R. 307).  She also complained of constipation. (R. 307).  Upon physical examination, her kidneys were not palpable, the Mitrofanoff site was benign, and her scars from surgical incisions were well-healed; she did not report any tenderness. (R. 307).  Dr. Reda

increased her prescription for Ditropan, instructed her to continue using the Foley catheter overnight to help control leakage, and ordered another urodynamic test to evaluate her bladder. (R. 307).

## B. Consulting Physician

The administrative record contains an evaluation by consulting physician Steven Tsoutsouras, M.D. (R. 254-59). Dr. Tsoutsouras completed a pediatric examination of F.T. on November 9, 2013. (R. 254). F.T.'s parents accompanied her on the visit and provided her medical history. (R. 254). Regarding her kidneys, F.T. had congenital agenesis of the left kidney with an associated obstruction of the right kidney, and agenesis of the renal bladder. (R. 254, 258). These conditions required a nephrostomy, which was performed at Westchester Medical Center when she was a newborn. (R. 254-55, 258). She also underwent a kidney transplant in 2006 and bladder reconstruction in 2007, both at Westchester Medical Center. (R. 254-55, 258). Prior to her kidney transplant, she suffered from frequent UTIs. (R. 254, 258). At the time of the appointment, F.T. catheterized herself through the umbilicus several times a day. (R. 254, 258). She had monthly visits with a urologist and a nephrologist, and had been advised that she might need further surgeries in the future. (R. 254, 258).

Turning to other medical issues, Dr. Tsoutsouras noted that F.T. suffered from asthma since infancy and was affected year-round; specifically, she became short of breath when exercising. (R. 254, 258). She had been hospitalized once for her asthma at Westchester Medical Center when she was about three years old, and had last seen a healthcare provider for asthma approximately one year prior to the examination. (R. 254). F.T. also had congenital hypothyroidism, for which she was not taking any medication, and anemia, for which she took iron supplements. (R. 254, 258). Finally, F.T. had a vision problem and had been wearing

glasses for several years, and had a strabismus of the left eye. (R. 254, 258). She had missed approximately five days of school in the previous school year. (R. 254). At the time of the examination, she was taking the following medication: (i) Cellcept; (ii) Prograf; (iii) Ferrex; (iv) Macrodantin; (v) Ventolin; and (vi) Ditropan. (R. 255).

Dr. Tsoutsouras noted that F.T. had been born at thirty-two weeks' gestation by cesarean section and weighed three pounds and four ounces at birth; she was in the neonatal intensive care unit for four months. (R. 255). He further stated that she was in special education due to her health issues. (R. 255). Her daily activities included watching television, listening to music, playing, doing her homework, reading, drawing and coloring, and playing on the computer. (R. 256). Upon physical examination, Dr. Tsoutsouras found that F.T. was in the fiftieth percentile of both height and weight. (R. 256). She did not need help getting on or off the exam table, and her gait was normal for her age. (R. 256). However, he observed "multiple surgical scars in the lower abdomen and extending to the right flank," and that she had a "small opening in the umbilicus where [she] catheterize[d] herself," and that the "area [was] leaking." (R. 257). Further, he indicated that her vision was "not grossly normal for [her] age." (R. 256).

Dr. Tsoutsouras gave F.T. the following diagnoses with associated prognoses: (i) agenesis of the left kidney with congenital obstruction of the right kidney, status post kidney transplant, prognosis unknown; (ii) asthma, prognosis fair; (iii) congenital hypothyroidism, prognosis fair; (iv) anemia, prognosis unknown; (v) vision problem, prognosis unknown. (R. 258). He concluded that F.T. should follow up with her primary care provider or healthcare provider for her asthma, congenital hypothyroidism and anemia, and with an ophthalmologist for her vision problem. (R. 258).

## C. State Agency Medical Consultant

A state agency medical consultant, S. Putcha, M.D., assessed the evidence of record on November 18, 2013. (R. 63-66). Dr. Putcha reviewed F.T.'s medical history, including her kidney problems, asthma and hypothyroidism. (R. 64). He found that the following diagnoses applied to F.T.: (i) congenital anomalies of urinary system; (ii) thyroid gland, all disorders (except malignant neoplasm); and (iii) asthma. (R. 63). He considered the impairments in the Listing of Impairments (individually, a "Listed Impairment"), and in particular, Listed Impairment 106.07 for congenital genitourinary impairment, and Listed Impairment 103.03 for asthma. (R. 63). Dr. Putcha found that although F.T.'s impairment or combination of impairments was severe, it did not meet, medically equal, or functionally equal a Listed Impairment. (R. 63). Specifically, he indicated that F.T. had no limitation in the first five functional domains,[8] and that she had a marked limitation in the sixth domain, health and physical well-being. (R. 63-64). He concluded that because F.T. did not have marked limitations in two or more domains, she was not disabled and her benefits should be denied. (R. 63, 65).

## D. F.T.'s Educational Records and Evaluations

F.T. attended P.S. 23 in the Bronx, The New Children's School, from September 2006 through the date of her application. (R. 139). In September 2011, Maria Almanzar, a school psychologist, completed a New York City Department of Education Psychological Update. (R. 229-31). Ms. Almanzar found that F.T. was "very strong with verbally expressing her ideas," and that she had "solid" scores in her abilities to read and write. (R. 230). Her "weakest area of

---

[8] *See* discussion *infra* III(A). The six functional domains are: (i) ability to acquire and use information; (ii) ability to attend and complete tasks; (iii) ability to interact and relate with others; (iv) ability to move about and manipulate objects; (v) ability to care for oneself; and (vi) health and physical well-being.

development" was in math. (R. 230).

An Individualized Education Program ("IEP") for F.T. was completed in May 2013. (R. 216-28). The report indicated that F.T. was meeting grade level standards in reading and writing, and approaching grade level standards in math. (R. 216). The IEP further noted that F.T. "[got] along well with both adults and peers," that she "enjoy[ed] socializing with her friends at lunch, without her paraprofessional present," and that she did not need to have the paraprofessional with her at lunch. (R. 216). F.T. had a catheter, which she changed by herself throughout the day, she went to the bathroom by herself, and she visited the nurse three to four times daily, always before gym and after lunch. (R. 217). The report explained that she required nursing support due to her use of the catheter, that she was classified as "Other Health Impaired," and that she had bladder surgery in 2009. (R. 217). It was further observed that F.T. was "prone to getting pneumonia," that she took "asthma medication in school on an as needed basis," and that she could request to use the elevator if she felt "fatigued or sick," but that she was encouraged to use the stairs. (R. 217). The report concluded that F.T. demonstrated awareness of her medical needs and could advocate for herself, and that she could participate in the general education class with the support of Special Education Teacher Support Services and Health Services. (R. 217).

In October 2013, F.T.'s teacher for all academic areas, Marissa O'Connor, completed a teacher's questionnaire. (R. 144-54). Ms. O'Connor saw her Monday through Friday for about seven hours each day. (R. 145). She indicated that Plaintiff did not require any special education services, and that she did not have an unusual degree of absenteeism. (R. 145, 153). Ms. O'Connor assessed F.T.'s limitations in the six functional domains[9] as follows: (i) no problems

---

[9] See discussion infra III(A).

in acquiring and using information; (ii) no problems attending and completing tasks; (iii) no problems interacting and relating with others; (iv) no problems moving about and manipulating objects; and (v) no problems caring for herself. (R. 146-50). Turning to the sixth domain, health and physical well-being, Ms. O'Connor noted that F.T. had a history of asthma and a neurogenic bladder, which required self-catheterization, and that the academic day was interrupted in the "AM" and "PM" because she needed to self-catheterize. (R. 151).

A second IEP was completed in May 2014, when F.T. was in fifth grade. (R. 500-08). Her reading was assessed as above grade level, her writing was at grade level, and her math was approaching grade level. (R. 500). The report indicated that she "like[d] to read and write." (R. 501). As in the IEP from the previous year, it was reported that F.T. "[got] along well with both adults and peers," that she "enjoy[ed] socializing with her friends at lunch, without her paraprofessional present," and that she did "not need to have a paraprofessional with her at lunch." (R. 501). In terms of her physical development, F.T. could change her catheter by herself throughout the day, went to the bathroom by herself, but also visited the nurse two to three times per day because she required support for the use of her catheter. (R. 501). She also required the supervision of a 20% health paraprofessional "to ensure her health and safety throughout the school day and to help her to become independent in handling her medical needs." (R. 501). Although F.T. demonstrated awareness of her health needs, the report recommended that the paraprofessional should help her develop a system for monitoring her catheterization supplies, and should also remind her to drink enough water throughout the day. (R. 501-02). It was again noted that she was "prone to getting pneumonia," and that although she required access to an elevator, she should "be encouraged to use the stairs." (R. 501). F.T. could participate in the general education class with the support of Special Education Teacher

Support Services and Health Services, but required special transportation accommodations. (R.
502, 506).

## E. The Function Report

On the date of F.T.'s application for SSI, July 23, 2013, Plaintiff completed an SSA

function report form. (R. 122-31).  She checked boxes to indicate that F.T. had problems seeing,

(R. 123), and that she was "not sure" whether F.T.'s ability to progress in learning was limited,

but then proceeded to check boxes indicating that F.T. could perform all of the learning-related

skills that were listed, (R. 126).  She did not provide any remarks in the narrative section of the

report. (R. 131).

## F. June 9, 2015 Hearing before ALJ Grossman

Plaintiff and F.T. both testified at the June 9, 2015 hearing before ALJ Grossman, as did

a medical expert, Dr. Robert Berk.[10] (R. 28-59).  F.T. was represented by an attorney and

testified first. (R. 31-49).  Upon questioning by the ALJ, she stated that she was in sixth grade.

(R. 32).  She said that she participated in gym, during which she played sports such as basketball

and volleyball. (R. 34).  When asked whether she had a lot of friends or few friends, she

responded, "in the middle." (R. 34).  She testified that, as of June, she had been absent five or six

times over the course of the school year, and that she was most recently hospitalized several

weeks prior for "sharp pains in [her] stomach." (R. 35, 37).  Her previous hospitalization had

been approximately three years earlier. (R. 37).  F.T.'s attorney questioned her next, with

additional intermittent questioning by the ALJ. (R. 38-49).  F.T. stated that she had a

paraprofessional at school who helped her go to the bathroom, which took about five minutes,

and described leaking approximately four times per school day. (R. 38-39).  She explained that

---

[10] The transcript misspells the medical expert's name as Robert Burke, (R. 29), and Robert Burk, (R. 31).

she had to bring catheters and lubricant to school, and that she also brought spare clothes in case she leaked. (R. 40). She testified that she leaked about five to six times from when she returned from school in the afternoon "to the night," and that she did not get up during the night to urinate, but instead "leak[ed] or . . . use[d] a bag." (R. 41, 45). She said that she did not get together with her friends outside of school because of leaking. (R. 45). F.T. also testified that she had trouble tying her shoes because her hands were "weak," and that she could not run for very long, if at all, during basketball or volleyball because of her asthma. (R. 48). She explained that she got "short of breath" after approximately ten minutes. (R. 49).

Plaintiff testified next, and was questioned both by F.T.'s attorney and ALJ Grossman. (R. 33, 50-55). She testified that her daughter was reading above grade level and that she sometimes did her homework, but that she was "not doing that well" in math. (R. 33). Plaintiff said that the school doctor called when her daughter was unwell, approximately once a week, and that F.T. had in fact missed more than five or six days of school. (R. 50-51). While she could not remember the exact number, she said that it was "a lot of days." (R. 51). She further explained that F.T. took a "disability bus" to school. (R. 53). Regarding her daughter's recent hospitalization, Plaintiff stated that she brought her daughter to the emergency room after she complained of a stomach ache and that she was diagnosed with a UTI, which was treated with antibiotics. (R. 51-52). Plaintiff stayed at the hospital overnight. (R. 52). Finally, she testified that she helped her daughter tie her shoes every day, because F.T. could not tie them. (R. 55).

F.T.'s counsel argued that she met Listed Impairments 106.04 for chronic kidney disease with kidney transplant, and 106.07 for congenital genitourinary disorder. (R. 35-37; *see also* 20 C.F.R. pt. 404, subpt. P., app. 1, 106.00 *et seq.*). She argued that F.T. had a residual impairment because she had a re-constructed bladder and was unable to urinate, and had to use a Mitrofanoff

catheter. (R. 36).

Dr. Berk testified last. (R. 55-58). He testified that he had considered Listed Impairment 106.04. (R. 56). The ALJ asked him whether he was correct that F.T. did not meet any Listed Impairment, and Dr. Berk responded: "I think that's correct that she does not meet a listing." (R. 57). Turning to the six functional domains the ALJ was required to assess,[11] Dr. Berk found that F.T. had no impairments in the first three, that she had a less than marked impairment in her abilities to move and manipulate objects and care for herself, and that she had an extreme impairment in the domain of general health and well-being. (R. 57). Upon questioning by F.T.'s attorney, Dr. Berk stated that his conclusion regarding her extreme impairment was based on the prognosis of F.T.'s underlying condition, as well as her ability to function. (R. 58). He further noted that, in terms of F.T.'s functional abilities, she had a urethral opening in her umbilicus which required treatment or assistance several times per day, and that she was affected daily, on a regular, continuing basis. (R. 58).

## II. THE ALJ'S DECISION

The ALJ applied the three-step evaluation process for determining disability in a child in his August 6, 2015 decision. (R. 6-24). He noted that she was a school-aged child on the date the application was filed, and that she was an adolescent on the date of his decision. (R. 12). At the first step, ALJ Grossman found that F.T. had not engaged in "substantial gainful activity since July 23, 2013, the application date." (R. 12). At the second step, the ALJ determined that F.T. had the following severe impairments: an opening in her umbilicus, status post kidney transplant, status post catheter installation and asthma. (R. 12).

---

[11] *See* discussion *infra* III(A).

At the third step, the ALJ held that F.T. did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled the Listed Impairments found at "20 C.F.R. Part 404, Subpart P, Appendix 1." (R. 12). In determining whether F.T.'s impairments functionally equaled the severity of a Listed Impairment, ALJ Grossman assessed six functional domains[12] and found as follows: (i) F.T. had no limitation in acquiring and using information, attending and completing tasks, and interacting and relating with others; (ii) F.T. had a less than marked limitation in moving about and manipulating objects, and caring for herself; and (iii) F.T. had a marked limitation in her health and well-being. (R. 15-23).

In coming to these conclusions, ALJ Grossman considered "all of the relevant evidence in the case record" and "considered the opinion evidence in accordance with 20 C.F.R. [§] 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (R. 12, 13). The ALJ gave highly significant weight to the opinions Dr. Berk expressed at the hearing, with the exception of his opinion that F.T. had extreme limitations in the functional domain of health and physical well-being, which he accorded less than significant weight. (R. 13-14). Rather, he found that the evidence of record did not support an extreme limitation in the domain of health and physical well-being. (R. 20-23). The ALJ also gave highly significant weight to the opinions set forth in F.T.'s IEPs. (R. 14). The ALJ accorded significant weight to the report of Dr. Tsoutsouras, the consultative examiner. (R. 14). Finally, he gave partial weight to the Teacher Questionnaire submitted by F.T.'s general education teacher. (R. 14). He found that the assessments in the Teacher Questionnaire regarding the first five functional domains were supported by the evidence of record, but that the teacher's opinion regarding F.T.'s limitation in the sixth domain of health and well-being was not supported. (R. 14). The ALJ concluded that F.T. had not been disabled, as defined in the

---

[12] See discussion *infra* III(A).

Act, since July 23, 2013, the date the application was filed. (R. 24).

## III. DISCUSSION

The Commissioner argues that the ALJ's decision was supported by substantial evidence and should be affirmed. (Docket No. 13). More specifically, the Commissioner asserts that there is substantial evidence in the record that supports the ALJ's conclusions regarding each of the six functional domains,[13] and that F.T.'s impairment or combination of impairments did not meet, medically equal or functionally equal a Listed Impairment. (Docket No. 13).

Plaintiff's form complaint summarily argues that ALJ Grossman's decision "was erroneous, not supported by substantial evidence in the record, and/or contrary to law." (Docket No. 2 at ¶ 9). As noted above, Plaintiff did not file a motion for judgment on the pleadings, or an opposition to the Commissioner's motion. Although the Commissioner's motion is unopposed, the Court must nevertheless review the record to determine whether there are sufficient grounds to grant the motion. *Ortiz v. Commissioner of Social Security*, No. 15-CV-7602 (SN), 2017 WL 519260, at *5 (S.D.N.Y. Feb. 8, 2017) (citations omitted). Moreover, because Plaintiff is proceeding *pro se*, she is "entitled to a liberal construction of [her] pleadings," and her complaint "should be read to raise the strongest arguments that [it] suggest[s]." *Id.* at *6 (citations and quotation marks omitted).

## A. Legal Standards

A claimant under the age of 18 is disabled if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). "[T]he SSA has

---

[13] *See* discussion *infra* III(A).

enacted a three-step sequential analysis to determine whether a child [is] eligible for SSI benefits on the basis of a disability." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (citing 20 C.F.R. § 416.924(a)). At step one, "the ALJ considers whether the child is engaged in 'substantial gainful activity.'" *Id.* (quoting 20 C.F.R. § 416.924(b)). At step two, "the ALJ considers whether the child has a 'medically determinable impairment that is severe,' which is defined as an impairment that causes 'more than minimal functional limitations.'" *Id.* (quoting 20 C.F.R. § 416.924(c)). At the third, and last, step, "if the ALJ finds a severe impairment, he or she must then consider whether the impairment 'medically equals' or . . . 'functionally equals' a disability listed in the regulatory 'Listing of Impairments.'" *Id.* (quoting 20 C.F.R. § 416.924(c)-(d); *id.* pt. 404, subpt. P., app. 1).

Whether a child's impairment is a functional equivalent of a Listed Impairment requires an assessment of six domains, the child's: (i) ability to acquire and use information; (ii) ability to attend and complete tasks; (iii) ability to interact and relate with others; (iv) ability to move about and manipulate objects; (v) ability to care for oneself; and (vi) health and physical well-being. *Pollard*, 377 F.3d at 190 (quoting 20 C.F.R. § 416.926a(a)-(b)). If the child exhibits a "marked" limitation in two of these domains, or an "extreme" limitation in one of these domains, the child's disability is functionally equivalent to a Listed Impairment. 20 C.F.R. § 416.926a(a); *Pollard*, 377 F.3d at 190 (citation omitted). A "marked" limitation in a domain exists when the child's "impairment(s) interferes seriously with [his or her] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "It is the equivalent of the functioning [the SSA] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.* An "extreme" limitation in a domain exists when the child's "impairment(s) interferes very seriously with [his or her] ability

to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).  An

"extreme" limitation "does not necessarily mean a total lack or loss of ability to function.  It is

the equivalent of the functioning [the SSA] would expect to find on standardized testing with

scores that are at least three standard deviations below the mean." *Id.*  In evaluating the child's

domains, the SSA "will assess the interactive and cumulative effects of all of the impairments for

which [it has] evidence, including any impairments [the child has] that are not 'severe.'" 20

C.F.R. § 416.926a(a).

**B.  Standard of Review**

When reviewing an appeal from a denial of Social Security benefits, the Court's review is

"limited to determining whether the SSA's conclusions were supported by substantial evidence

in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d

Cir. 2013) (citations and quotation marks omitted); *see also* 42 U.S.C. § 405(g).  The Court does

not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is

disabled." *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original)

(citations and quotation marks omitted).  However, where the proper legal standards have not

been applied and "might have affected the disposition of the case, [the] court cannot fulfill its

statutory and constitutional duty to review the decision of the administrative agency by simply

deferring to the factual findings of the ALJ.  Failure to apply the correct legal standards is

grounds for reversal." *Pollard*, 377 F.3d at 189 (citation and quotation marks omitted).  "Where

there are gaps in the administrative record or the ALJ has applied an improper legal standard,"

remand to the Commissioner "for further development of the evidence" is appropriate. *Rosa v.

Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999) (citations and quotation marks omitted).

## C. Duty to Develop the Record and the Treating Physician Rule

The ALJ has an affirmative obligation to develop the record due to the nonadversarial nature of the administrative proceeding. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citations omitted).  This duty to develop the record remains where the claimant is represented by counsel. *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).  As part of this obligation, the ALJ "is required to make 'every reasonable effort' to obtain a claimant's treating physician's medical reports. . . . This means that the ALJ should make an initial request from the claimant's treating physician for records, plus one follow-up request." *Oliveras ex rel. Gonzalez v. Astrue*, No. 07 Civ. 2841 (RMB) (JCF), 2008 WL 2262618, at *6 (S.D.N.Y. May 30, 2008), *report and recommendation adopted*, 2008 WL 2540816 (S.D.N.Y. June 25, 2008) (citations omitted); *see also* 20 C.F.R. §§ 404.1512(b)(1), 416.912(b)(1)).  Thereafter, "if the documents received lack any necessary information, the ALJ should recontact the treating physician." *Oliveras*, 2008 WL 2262618, at *6 (citations omitted).  The ALJ must therefore seek additional evidence or clarification where the documentation "from a claimant's treating physician, psychologist, or other medical source is 'inadequate . . . to determine whether [the claimant] is disabled.'" *Antoniou v. Astrue*, No. 10-CV-1234 (KAM), 2011 WL 4529657, at *13 (E.D.N.Y. Sept. 27, 2011) (alterations in original) (citations omitted).  In carrying out this duty, "[t]he ALJ also has authority to subpoena medical evidence on behalf of the claimant." *Oliveras*, 2008 WL 2262618, at *6 (citing 42 U.S.C. § 405(d)).

The ALJ's duty to develop the record "dovetails with the treating physician rule, which requires controlling weight be given [to] the opinion of a claimant's treating physician when it is supported by accepted diagnostic techniques and not inconsistent with other evidence in the record." *Oliveras*, 2008 WL 2262618, at *6; *see also* 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2).  Indeed, "the 'treating physician rule' is inextricably linked to the duty to develop the record." *Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).  Specifically, "the ALJ must obtain the treating physician's opinion regarding the claimant's alleged disability; 'raw data' or even complete medical records are insufficient by themselves to fulfill the ALJ's duty. . . . It is the *opinion* of the treating physician that is to be sought; it is his *opinion* as to the existence and severity of a disability that is to be given deference.'" *Oliveras*, 2008 WL 2262618, at *6 (emphasis in original) (citing *Dimitriadis v. Barnhart*, No. 02 Civ. 9203 (DC), 2004 WL 540493, at *9 (S.D.N.Y. Mar. 17, 2004)). Therefore, until an ALJ satisfies the "'threshold requirement'" under the duty to develop the record, "'the ALJ cannot even begin to discharge his duties . . . under the treating physician rule.'" *Id.* (alteration in original) (quoting *Pabon v. Barnhart*, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003)).

Here, as in *Oliveras*, there are no opinions in the record from F.T.'s numerous treating physicians. *See* 2008 WL 2262618, at *7.  It is clear from the treatment notes in the record that, at the very least, Dr. Franco, Dr. Lew, Dr. Zelkovic and Dr. Zolotnitskaya were F.T.'s treating physicians. (*E.g.*, R. 247-52, 267-68, 297, 309-12, 315-16).  Moreover, the following doctors were explicitly listed as F.T.'s treating physicians, either on the Disability Report Appeal Form SSA-3441 and/or by Dr. Lew: (i) Dr. Lew for primary care; (ii) Dr. Trigger for asthma care and pulmonology at Children's and Women's Physicians of Westchester; (iii) Dr. Zolotnitskaya for nephrology; (iv) Dr. Zelkovic for urology; (v) Dr. Franco for urology; and (vi) Dr. Zang for vision. (R. 159, 238, 247).  Even the report of the consulting physician, Dr. Tsoutsouras, which the ALJ gave significant weight, (R. 14), stated that F.T. had monthly appointments with a

urologist and a nephrologist, (R. 254, 258). Nevertheless, there is no indication that the ALJ

sought or considered an opinion from any of F.T.'s treating physicians, despite his assertion that

he complied with the treating physician rule.[14] (R. 13). The ALJ instead made his determinations

regarding F.T.'s functional limitations based primarily on the IEPs, teacher questionnaire, the

function report and the medical expert's testimony.[15]  However, "[t]he opinion of a consulting

doctor who simply reviewed the medical data is not an adequate substitute for the opinion of a

physician who has been able to observe the claimant over a period of time." *Oliveras*, 2008 WL

2262618, at *7.

Furthermore, although Dr. Trigger is listed at least three times as F.T.'s treating

pulmonologist, (R. 159, 238, 247), and although the ALJ found that asthma was one of F.T.'s

severe impairments, (R. 12), there are no records from Dr. Trigger, or any pulmonologist.

Likewise, despite multiple indications that Dr. Zolotnitskaya was F.T.'s treating nephrologist,

there is only one record from her practice. (R. 297).  When F.T. was represented, her attorney

wrote to Chief ALJ Selwyn S.C. Walters to request that a subpoena be issued to "Bradhurst Peds

Nephrology, Children's and Women's Physicians of Westchester LLP." (R. 361).  It appears that

both Dr. Trigger and Dr. Zolotnitskaya may have been associated with that facility. (R. 159,

297).  Chief ALJ Walters responded that the request lacked sufficient "particulars," and there is

no indication that a subpoena was issued thereafter. (R. 360).  However, the ALJ has authority to

subpoena such medical evidence, and indeed has a duty to do so, even where a claimant is

represented. *See Oliveras*, 2008 WL 2262618, at *6; *Shaw*, 221 F.3d at 134; 20 C.F.R. § 405(d).

---

[14] ALJ Grossman wrote that he considered the opinion evidence in accordance with 20 C.F.R. § 416.927(c)(2),
which sets forth the treating physician rule, and SSR 96-2p, which explains the treating physician rule.

[15] The only evidence the ALJ relied on from a source who had examined F.T. was the report of the consulting
physician, Dr. Tsoutsouras, which he relied on in assessing the fourth domain, moving about and manipulating
objects. (R. 19).

The ALJ's failure to further develop the record warrants a remand.[16]   On remand, the ALJ should also inform Plaintiff that she may seek opinions or testimony from F.T.'s treating physicians. *Oliveras*, 2008 WL 2262618, at *7; *Jimenez v. Massanari*, No. 00-CV-8957 (AJP), 2001 WL 935521, at *11-12 (collecting cases regarding an ALJ's duty to inform a *pro se* plaintiff that she may seek a more detailed statement from her treating physician).

**D. Substantial Evidence**

The Commissioner contends that the ALJ's decision was supported by substantial evidence. (Docket No. 13).  However, "[w]here the ALJ has failed to develop the record, a reviewing court 'need not—indeed, cannot—reach the question of whether the Commissioner's denial of benefits was based on substantial evidence.'" *Oliveras*, 2008 WL 2262618, at *8 (quoting *Jones v. Apfel*, 66 F. Supp. 2d 518, 542 (S.D.N.Y. 1999)); *see also Armstrong v. Colvin*, No. 12 CV 8126 (VB)(PED), 2013 WL 6246491, at *19 (S.D.N.Y. Dec. 3, 2013) (finding that "[b]ecause there is legal error requiring remand, it is unnecessary to determine whether the ALJ's decision was supported by substantial evidence" as "the ALJ's failure to develop the administrative record would frustrate such an exercise." (citation omitted)); *Truesdale v. Barnhart*, No. 03-CV-0063 (SAS), 2004 WL 235260, at *7 (S.D.N.Y. Feb. 6, 2004) ("[B]ecause the Commissioner failed to fully develop the record . . . [the court] cannot conclude that the Commissioner's finding of no disability is supported by substantial evidence.'").  Therefore, "any review of whether the decision was based on substantial evidence must be deferred until the record is complete." *Oliveras*, 2008 WL 2262618, at *8.

---

[16] "Although a remand request is normally made by a party, there is no reason why a court may not order the remand *sua sponte*." *Legall v. Colvin*, No. 13 CV 1426 (VB)(LMS), 2014 WL 4494753, at *3 n.3 (S.D.N.Y. Sept. 10, 2014) (citation and quotation marks omitted).

**E. Remand**

Having determined that the ALJ's failure to develop the record was a legal error, the Court next considers what relief is appropriate. Sentence four of 42 U.S.C. § 405(g) states, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Courts "have opted simply to remand for a calculation of benefits" where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision[.]" *Rosa*, 168 F.3d at 83; *see also Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980) (reversing and ordering that benefits be paid where "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose."). On the other hand, "remand for further development of the evidence" may be appropriate "where there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa*, 168 F.3d at 82-83 (citations omitted).

Here, ALJ Grossman erred in failing to fully develop the record. Where "further findings will plainly help to assure the proper disposition of the claim," and "it is entirely possible that a complete record would justify the SSA's current conclusion that plaintiff was not disabled at the relevant time, remand for calculation of benefits is not appropriate[.]" *Lugo v. Barnhart*, No. 04 Civ. 1064 (JSR)(MHD), 2008 WL 515927, at *25 (S.D.N.Y. Feb. 8, 2008) (citation and quotation marks omitted), *report and recommendation adopted*, 2008 WL 516796 (S.D.N.Y. Feb. 27, 2008); *see also Booker v. Colvin*, No. 16-CV-1753 (JMF)(KNF), 2017 WL 633782, at *4 (S.D.N.Y. Jan. 31, 2017), *report and recommendation adopted sub nom. Booker v. Comm'r of Soc. Sec.*, 2017 WL 627457 (S.D.N.Y. Feb. 15, 2017) (finding legal error where the ALJ, *inter*

*alia*, failed to develop the record, and remanding pursuant to sentence four of 42 U.S.C. § 405(g)). Consequently, I recommend that the case be remanded under sentence four of 42 U.S.C. § 405(g) for further administrative proceedings.

## IV. CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that the Commissioner's motion should be denied and the case should be remanded for further administrative proceedings.

## V. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time). If copies of this Report and Recommendation are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written objections. *See* Fed. R. Civ. P. 6(d). Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Cathy Seibel at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

CASE 7:16-cv-05150-CS   Document 15   Filed 05/16/17   Page 27 of 27

Requests for extensions of time to file objections must be made to the Honorable Cathy Seibel and not to the undersigned.  Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).


Dated:   May 16, 2017
         White Plains, New York

                                            **RESPECTFULLY SUBMITTED,**


                                            _____
                                            JUDITH C. McCARTHY
                                            United States Magistrate Judge